UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID S. SMITH,                       :
                                      :
          Plaintiff                   :     CIVIL NO. 4:10-CV-2069
                                      :
     vs.                              :     (Judge Conaboy)
                                      :
MICHAEL J. ASTRUE,                    :
COMMISSIONER OF SOCIAL                :
SECURITY,                             :
                                      :
          Defendant                   :

<u>MEMORANDUM AND ORDER</u>

<u>BACKGROUND</u>

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff David S. Smith's claim for social security
disability insurance benefits and supplemental security income
benefits.  For the reasons set forth below we will affirm the
decision of the Commissioner.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Smith meets the insured status requirements of the

Social Security Act through December 31, 2013. Tr. 12, 14 and 134.[1]

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

Smith was born in the United States on September 27, 1953. Tr. 122.  Smith graduated from high school and can read, write, speak and understand the English language. Tr. 171 and 178. After high school he obtained in 1975 a Bachelor of Science degree in Business Management from York College. Tr. 178, 214, 462-463 and 493.  Although Smith has a college degree, his past relevant employment[2] is as a janitor or custodian.[3] Tr. 40, 463 and 493. Such employment is classified as unskilled, medium work.[4] Tr. 40.

---

1. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on December 17, 2010.

2. Past relevant employment in the present case means work performed by Smith during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3. A vocational expert referred to the position as an industrial or institutional cleaner. Tr. 40.

4. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and
>
> (continued...)

Records of the Social Security Administration reveal that Smith had earnings in the years 1967 through 2008. Tr. 135.

---

4.   (...continued)
small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

3

During the years 1967 through 1970 his yearly income was less than $1000.00; during the years 1971 through 1979, his yearly income was less than $7500.00; and during the years 1980 through 1993 his yearly income was less than $16,000.00 Id.  During the last 15 years Smith was employed his earnings were as follows:

| | |
|---|---|
| 1994 | $ 8937.20 |
| 1995 | 14859.69 |
| 1996 | 17363.64 |
| 1997 | 20570.44 |
| 1998 | 17253.61 |
| 1999 | 19655.06 |
| 2000 | 19286.47 |
| 2001 | 18665.94 |
| 2002 | 21092.53 |
| 2003 | 24065.21 |
| 2004 | 23409.75 |
| 2005 | 12028.09 |
| 2006 | 18279.71 |
| 2007 | 18629.29 |
| 2008 | 8724.29 |

Id.  Smith's total earnings from 1967 through 2008 were $432,282.95. Id.

Smith does not contend that he is disabled because of a physical impairment.[5]  Smith claims that he became disabled on May 15, 2008,[6] because of depression, bipolar disorder, anxiety, obsessive compulsive disorder (sexual addiction), and a history of

5.  As will be addressed *infra*, the administrative law judge found that Smith had the physical ability to perform work at all of the exertional levels, i.e., sedentary through very heavy work. Smith does not contest that finding.

6.  Smith was 54 years of age on the alleged disability onset date.

suicide attempts. Tr. 60 and 172; Doc. 9, Plaintiff's Brief, p. 1.
On May 15, 2008, Smith attempted to commit suicide by drinking
hydrogen peroxide and windshield washer fluid. Tr. 268.  Smith has
not worked since May 15, 2008. Tr. 172.

  On May 22, 2008, Smith protectively filed[7] an
application for disability insurance benefits and an application
for supplemental security income benefits. Tr. 12, 48, 122-131,
134 and 160.  On April 14, 2008, the Bureau of Disability
Determination[8] denied Smith's applications. Tr. 60-69.  On August
26, 2008, Smith requested a hearing before an administrative law
judge. Tr. 56-57.  Approximately 10 months later, a hearing
commenced on June 10, 2009, before an administrative law judge.
Tr. 43-47.  That hearing was aborted after approximately two
minutes. Id.  The hearing was continued to and held on October 27,
2009. Tr. 26-42.  On November 24, 2009, the administrative law
judge issued a decision denying Smith's applications. Tr. 12-20.
On January 12, 2010, Smith requested that the Appeals Council
review the administrative law judge's decision. Tr. 7-8 and 203.

---

7.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

8.  The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security
Administration.  Tr. 61 and 66.

After about 8 months, the Appeals Council on August 9, 2010, concluded that there was no basis upon which to grant Smith's request for review. Tr. 2-6.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On January 5, 2010, Smith filed a complaint in this court requesting that we reverse the decision of the Commissioner denying him disability insurance benefits and supplemental security income benefits.  The Commissioner filed an answer to the complaint and a copy of the administrative record on December 17, 2010.  Smith filed his brief on January 11, 2011, and the Commissioner filed his brief on March 16, 2011.  The appeal[9] became ripe for disposition on April 4, 2011, when Smith elected not to file a reply brief.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

---

9.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

to determine whether those findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001);  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008);  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213.  In an adequately developed factual

record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is

---

10. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

9

severe or a combination of impairments that is severe,[11] (3) has

an impairment or combination of impairments that meets or equals

the requirements of a listed impairment,[12] (4) has the residual

functional capacity to return to his or her past work and (5) if

not, whether he or she can perform other work in the national

--------

11.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).


12.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

10

economy.  Id.  As part of step four the administrative law judge
must determine the claimant's residual functional capacity.  Id.[13]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis.  See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A
regular and continuing basis contemplates full-time employment and
is defined as eight hours a day, five days per week or other
similar schedule. The residual functional capacity assessment must
include a discussion of the individual's abilities.  Id; 20 C.F.R.
§§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1
("'Residual functional capacity' is defined as that which an
individual is still able to do despite the limitations caused by
his or her impairment(s).").

**MEDICAL RECORDS**

The administrative record in this case is 515 pages in
length and we have thoroughly reviewed that record.  Before we
address the administrative law judge's decision and the arguments
of counsel, we will review in detail Smith's medical records.  We
will commence by reviewing medical records that pre-date Smith's
alleged disability onset date of May 15, 2008.

---

13.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

11

On May 3, 2001, Smith was evaluated by Gary B. Zimberg,
M.D., a psychiatrist, at Wellspan Behavioral Health Services,
York, Pennsylvania. Tr. 214-216.   Smith voluntarily contacted Dr.
Zimberg for an evaluation and treatment of anger, depression and
anxiety. Id.  At that appointment with Dr. Zimberg, Smith
"report[ed] stress at home due to difficulty controlling his
temper, but also several vegetative symptoms of depression
including sleep disturbance, tearfulness, lethargy, and lack of
interest in pleasurable activities." Id.  Dr. Zimberg's interview
of Smith revealed that Smith's "[s]tressors includ[ed] [an]
estranged relationship with his live-in girlfriend and chronic job
dissatisfactions." Id.  The social history portion of Dr.
Zimberg's report states that Smith was never married and that
"[h]e has lived with a woman since 1987 and reports a somewhat
platonic relationship in the past year. He works as a janitor for
a local school district[14] and is quite dissatisfied with his
career path." Id.  Smith denied drug or alcohol use and stated
that he did not smoke. Id.  Dr. Zimberg's mental status
examination of Smith was essentially normal. Id.  Dr. Zimberg did
note that Smith's mood was fair and his affect constricted. Id.
Dr. Zimberg's assessment/diagnosis was that Smith suffered from

_____

14.  As stated earlier, in 2001 Smith was employed and earned a
total of $18665.94.

12

major depression, recurrent, and he gave Smith a Global Assessment
of Functioning (GAF) score of 51.[15] Id.  Dr. Zimberg prescribed
the drug Remeron[16] and referred Smith to a therapist.

It appears that Smith only had two follow-up
appointments with Dr. Zimberg on May 18 and 30, 2001.  On May 18,
2001, Smith "accompanied by his father" was seen by Dr. Zimberg
for a medication check. Tr. 213.  At that appointment Smith

---

15.  The Diagnostic and Statistical Manual of Mental Disorders
uses a multiaxial approach in diagnosing mental disorders. The
GAF score allows a clinician to indicate his judgment of a
person's overall psychological, social and occupational
functioning, in order to assess the person's mental health
illness.  *Diagnostic and Statistical Manual of Mental Disorders*
3-32 (4th ed. 1994). A GAF score is set within a particular range
if either the symptom severity or the level of functioning falls
within that range. Id. The score is useful in planning treatment
and predicting outcomes. Id.  A GAF score of 21-30 represents
behavior considerably influenced by delusions or hallucinations
or serious impairment in communication or judgment or inability
to function in almost all areas.  A GAF score of 31-40 represents
some impairment in reality testing or communication or major
impairment in several areas, such as work or school, family
relations, judgment, thinking or mood. Id.  A GAF score of 41-50
indicates serious symptoms or any serious impairment in social,
occupational or school functioning. Id.  A GAF score of 51 to 60
represents moderate symptoms or any moderate difficulty in
social, occupational, or school functioning. Id. A GAF score of
61 to 70 represents some mild symptoms or some difficulty in
social, occupational, or school functioning, but generally
functioning pretty well with some meaningful interpersonal
relationships. Id.

16.  "Remeron (mitrazapine) is a tetracyclic antidepressant . . .
Remeron is used to treat major depressive disorder." Remeron,
Drugs.com, http://www.drugs.com/remeron.html (Last accessed
October 25, 2011).

"appeared euthymic and displayed some humor. He acknowledged persistent irritability, with some behavioral outbursts, none especially dangerous." Id.  Smith stated that he felt "better since starting Remeron" and denied adverse side effects. Id.  Dr. Zimberg continued the prescription for Remeron. Id.  It was also noted that Smith was scheduled to commenced individual therapy. Id.  On May 30, 2001, Smith "appeared in fair spirits with some display of humor" and Smith reported "improvement in sleep on Remeron[.]" Tr. 212.  Dr. Zimberg increased Smith's dosage of Remeron. Id.

The next medical record is a one-page document dated March 7, 2003, which reveals that Smith was treated for an inflammation under the left armpit. Tr. 382.

On August 18, 2003,[17] Smith was administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) by Dolph M. Frintz, Ph.D., a clinical psychologist. Tr. 210-211.  This psychological testing was requested by Joseph A. Buzogany, M.D., a psychiatrist at Wellspan Behavioral Health Services, "to gauge the severity and extent of [Smith's] psychopathology." Id.  Smith was referred to Dr. Frintz because of "behaviors suggesting sexual addiction." Id.  Dr. Frintz in his report of the testing stated

---

17. As stated earlier, in 2003 Smith was employed and earned a total of $24065.21. In the year 2004, Smith was also employed and earned $23409.75.

that the "findings support the notion of his 'Addiction-
Proneness.' In any event, he has difficulty obtaining any
pleasurable positive reinforcement through healthy work or
relationship avenues." Id.  Dr. Frintz concluded that Smith was
"chronically and markedly depressed, anxious, underachieving,
insecure, socially avoidant and unskilled, and despairing" and
that Smith was "a clear risk for suicide" and that Smith's MMPI-2
profile indicated that he "may not want therapy because he does
not believe that it (or anything) will make a difference." Id.
There are no other medical records from the 2001-2004 time period.

        The next medical records that we encounter are from
April and May, 2005.  First there is a psychiatric progress note
prepared by Dr. Buzogany dated April 22, 2005. Tr. 209. This
progress note is only partially legible.  However, we can discern
that the progress note is commenting on Smith's involvement with
prostitutes and his sex addiction.  The note indicates that Smith
was in therapy and that Dr. Buzogany prescribed the drug
Depakote.[18]  Second there is a progress note prepared by Dr.
Buzogany dated May 6, 2005.  Tr. 207-208.  The progress note
indicates that Smith had a medication check on that date and that

----

18.  The drug Depakote (divalproex sodium) is used to treat
"mania or mixed episodes associated with bipolar disorder (manic
depressive disorder)[.]" Valproic acid, PubMed Health,
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/ (Last
accessed October 25, 2011).

Smith was "compliant with the Depakote and tolerating it well."
Id.  At this appointment Smith requested that his care be
transferred to a former psychiatrist. The note suggests that Smith
was having significant legal problems and he wanted the
psychiatrists - Dr. Buzogany and Dr. Zimberg – to provide a letter
to the state court indicating that he had been under their care
for an extended period of time.  The progress note states in
relevant part as follows:

> [T]he issue came up of Mr. Smith wanting to transfer
> his care to another psychiatrist.  I attempted to
> process this with Mr. Smith. He had made this request
> over the telephone between the last two appointments.
> He wished to, at this time, transfer his care back to
> Dr. Zimberg whom he had seen several years ago. I
> discussed the case with Dr. Zimberg and we have agreed
> that Mr. Smith would best be served outside of the
> group. Mr. Smith is currently experiencing significant
> legal troubles related to prostitution.  At his last
> visit he had requested a letter from this provider to
> his attorney explaining that he was under this
> provider's care during the incidents to help him with
> his Court case. Unfortunately Mr. Smith had discontinued
> his treatment a year to a year and one half ago and was
> not under this provider's care during that time.  I was
> unable to write the letter for Mr. Smith which appears
> to be the primary point of contention. As a result, we
> have agreed to refer Mr. Smith for psychiatric care
> outside of the Wellspan Group. . . At Mr. Smith's
> request, I will discharg him from my care and offer
> him a list of providers. . . Mr. Smith declined to have
> any information presented to him and left the office.

Tr. 208.

From July 11 to 16, 2006, Smith was hospitalized at the
York Hospital for a left thumb abscess involving methicillin-

16

resistant Staphylococcus aureus. Tr. 222-225,230-233 and 235-242.
The abscess was successfully treated with antibiotics and surgical
incision and he was discharged from the hospital on July 16, 2006.
Id.

On September 13, 2006, Smith was voluntarily admitted to
the psychiatric unit at the York Hospital "complaining of
worsening depression and suicidal thoughts." Tr. 226-229. His
chief complaint was "I don't like to be alone." Id.  At the time
he was taking no medications. Tr. 227. His mental status at
admission was described as follows: "Casually dressed man,
cooperative, pleasant, with good eye contact. Speech is fluent.
Mood is 'depressed.' Affect is a little nervous. Denies current
suicidal/homicidal ideation.  Thought content and thought
processes are clear, goal directed, and without evidence of
psychotic symptoms.  Cognitions are grossly intact. Sensorium is
clear.  Insight and judgment are fair." Id.  His GAF score at
admission was 35. Tr. 226.  The assessment of the attending
psychiatrist, Stephen L. Dilts, Jr., M.D., was that Smith suffered
from major depression, recurrent, moderate; impulse control
disorder, not otherwise specified; sexual addiction; and a history
of social anxiety. Tr. 226.  During Smith's stay at the hospital
Dr. Dilts concluded that although "[t]here had been some possible
history of bipolarity" after "reviewing the history with him

17

personally, observing him on the unit, and reviewing old records .
. . there really did not appear to be good support for this.
Because of his history of social anxiety as well as compulsive
behaviors, it was opted to start Zoloft 50 milligrams in the AM .
. . He tolerated this fairly well." Tr. 228. After group and
individual therapy, Smith's mood improved and his suicidal
ideation resolved. Id.  Smith was discharged from the hospital on
September 18, 2006, with a normal mental status examination and a
GAF score of 55.  Tr. 226 and 227-228.

On October 31, 2006, Smith underwent an evaluation at
Wellspan Behavioral Health. Tr. 331-333.  The three-page document
relating to this evaluation is barely legible. The name of the
person performing the evaluation is illegible. However, the
individual performing the evaluation had obtained a Master of
Science degree. Tr. 333.  The three-page document reveals that
Smith had a long history (over 30 years) of engaging prostitutes
which commenced during his sophomore year at York College, York,
Pennsylvania. Tr. 331.  It also reveals that his addiction
resulted in the dissipation of $10,000 of retirement funds and
that it was the impetus for his filing bankruptcy and the breakup
of an 18-year relationship with a live-in girlfriend. Tr. 331-332.
The mental status examination on October 31, 2006, was essentially
normal except his mood appeared depressed and his concentration

18

was impaired. Tr. 332.  He did not express any suicidal or
homicidal ideations. Id.  The individual who examined Smith
concluded he suffered from an adjustment disorder with depressed
mood; bipolar disorder based on Smith's self-report; and a sexual
disorder, not otherwise specified. Tr. 333.  The evaluator also
gave Smith a current GAF score of 59 and the highest GAF score in
the past year of 63. Id.

        The next medical record is a two-page document from
Lancaster General Hospital dated June 2, 2007, which reveals that
Smith visited the emergency department for the treatment of
multiple facial abrasions.  Smith reported that he was walking
down the street, someone asked him for a cigarette and when he
refused he was assaulted. Tr. 451.  Smith was examined, treated
and discharged the same day. Tr. 452.

        Smith received outpatient psychiatric therapy at
Philhaven[19] during November, 2007, and January, 2008. Tr. 311-320.
The documents relating to these sessions (November 5 and 12, 2007,
and January 21, 2008) detail Smith's sexual addiction. Id.  The
documents further reveal he was diagnosed with bipolar disorder,
not otherwise specified, and paraphilia, not otherwise specified.
Id.  He was assessed with a GAF score of 60 on November 5, 2007,

---

19.  Philhaven appears to be an organization providing outpatient
counseling services and located in Mt. Gretna, Pennsylvania. Tr.
312.

and on January 21, 2008. Tr. 319 and 406.  A document from the
November 5th session states in part as follows: "Client is a 54
year old single caucasian male, with college degree, honorable
discharge from Army, but may be underachieving in employment. He
has no credit due to amassing large expenses on credit cards for
prostitutes.  He reported prior Bipolar diagnosis, is off
medications, and is trying to avoid 'sexual addiction'[]
frequenting prostitutes." Tr. 319.

     On December 19, 2007, Smith was voluntarily admitted to
the Lancaster General Hospital for a psychiatric evaluation. Tr.
449-450.  At the time of admission he was depressed and having
suicidal ideations ("jump[ing] off of Chiques Rock")[20] and he was
assessed with a GAF score of 35. Tr. 255 and 465.  Smith was
started on the drug Celexa.[21] Tr. 465. Smith was discharged from
the hospital on December 24, 2007, with a diagnosis of generalized
anxiety disorder and a GAF score of 60. Tr. 259.  The discharge

_____

20.  Chickies Rock Park is "[l]ocated between the boroughs of
Columbia and Marietta" in Lancaster County. "The park includes
Chiques Creek, Donegal Creek and selected points to the
Susquehanna River." One feature of the park is "a massive
outcropping of quartzite rock towering 200 feet above the river."
Lancaster County Department of Parks and Recreation, Chickies
Rock Park, http://www.co.lancaster.pa.us/parks/cwp/view.
asp?a=676&q=518276 (Last accessed October 26, 2011).

21.  "Celexa (citalopram) is an antidepressant in a group of
drugs called selective serotonin reuptake inhibitors (SSRIs)."
Celexa, Drugs.com, http://www.drugs.com/celexa.html (Last
accessed October 26, 2011).

summary stated in pertinent part as follows: "He was admitted feeling very suicidal and very overwhelmed with anxiety. He was started on Celexa . . . and Klonopin[22] was added . . . He tolerated those without any difficulty. He did participate in group therapies.  He agreed to referral to T.W. Ponessa for their specialized program for those that seem to have impulses regarding sexual behaviors. . .  By the time of discharge, he denied any suicidal thoughts, and he had no psychosis and no homicidal thoughts[.]" Id.  He was given a one-month supply of Celexa and Klonopin. Id.

A January 9, 2008, progress note from Norlanco Medical Associates, Elizabethtown, Pennsylvania, reflects that Smith had not been taking his medication "for quite some time" but a February 11, 2008, progress note stated that Smith was "doing much better on the Celexa and is having no trouble whatsoever."  Tr. 243-244. From February 11 to May 15, 2008, there is no indication in the medical records that Smith was having difficulty. Tr. 244 and 322.

On May 15, 2008, Smith was admitted to the hospital after attempting suicide by drinking a bottle of peroxide and some de-icing windshield washer fluid which contains methanol, and was

---

22.  "Klonopin is used to treat seizure disorders or panic disorder." Klonopin, Drugs.com, http://www.drugs.com/klonopin .html(Last accessed October 26, 2011).

hospitalized until May 23, 2008. Tr. 446-447.  He was initially admitted to the Lancaster General Hospital and then transferred to the Harrisburg Hospital. Tr. 429.  An initial psychological assessment performed by a certified nurse practitioner on May 16, 2008, stated that he was suffering from bipolar disorder, generalized anxiety disorder, and sex addiction with a GAF score of 25. Tr. 275.  His physical problems were successfully treated over several days, including undergoing hemodialysis. Tr. 264.

On May 18, 2008, Smith was transferred to the Lancaster Hospital for psychiatric care. Tr. 278.  The admitting diagnosis at that facility was bipolar disorder, not otherwise specified, and sexual addiction (paraphilia). Tr. 280.  He was given a GAF score of 35. Id.  Smith was treated with the drugs Celexa and Abilify[23] and engaged in recreational therapy. Tr. 308-309   On May 23, 2008, Smith was discharged from the hospital.  Tr. 281. At discharge the diagnosis was that Smith suffered from bipolar disorder, not otherwise specified, and paraphilia.  Tr. 281. Smith was given a GAF score of 60. Id.   At the time of discharge, he was prescribed Abilify, Celexa, and Klonopin and directed to

---

23.  "Abilify is used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression). It is also used together with other medications to treat major depressive disorder in adults." Abilify, Drugs.com, http://www.drugs.com/abilify.html (Last accessed October 26, 2011).

22

have an appointment with Bruce Whittmaier, Ph.D., a psychologist,
on May 23, 2008, at Wellspan; an appointment with Lorin K.
Beidler, M.D., at Norlanco Medical Associates on June 13, 2008;
and an appointment with a psychiatrist, Dr. Kravitz, at Wellspan
on October 16, 2008. Id.  He was also referred to a support group.
Id.

On June 10, 2008, Smith had an appointment with Dr.
Beidler. Tr. 322.  Dr. Beidler noted that Smith "[i]n general
[][was] well appearing" and "in no acute distress." Id.  Smith's
affect was flat and his mood was congruent. Id.  Dr. Beidler's
assessment was that Smith suffered from depression and he
prescribed Celexa and Ambien.[24] Tr. 321.

On July 1, 2008, Smith had a follow-up appointment with
Dr. Beidler regarding his depression. Tr. 422. Dr. Beidler noted
that Smith was doing well and had no complaints. Id.  Smith
further stated that he was "not feeling anxious" although he was
having a little trouble sleeping. Id.  Smith told Dr. Beidler that
his family was "working at getting him placed in a residential
facility." Id.  Dr. Beidler noted that Smith appeared well and was
in no acute distress. Id. Smith was alert and oriented to person,

_____

24. "Ambien is a sedative, also called a hypnotic. . . [and] is
used for the short-term treatment of insomnia[.]" Ambien,
Drugs.com, http://www.drugs.com/ambien.html (Last accessed
October 26, 2011).

place and time. Id. Smith affect was mildly constricted and his
mood was congruent. Id. Dr. Beidler's assessment was that Smith's
depression was improving on the higher dose of Celexa and he made
no changes to Smith's medical regimen. Id.

On July 28, 2008, Smith was evaluated at Wellspan
by a medical provider.[25] Tr. 327-328.  The medical provider
concluded that Smith suffered from bipolar disorder, not otherwise
specified (DSM Code 296.80). Id.  However, the medical provider
indicated that Smith had no mania or hypomania, and no psychosis,
hallucinations or delusions; a mild impairment with respect to (1)
depression and sadness, (2) impulsive, aggressive, reckless and
self-injurious behavior, (3) anxiety, and (4) appetite
disturbance; and a moderate impairment with respect to (1)
thinking, memory and concentration, (2) activities of daily
living, (3) job performance, and (4) sleep disturbance. Id.  Smith
had no severe functional impairments. Id.

On July 29, 2008, Smith had an appointment with Dr.
Beidler. Tr. 422.  At that appointment Smith told Dr. Beidler that
he had found a group home setting that he was happy with, that he
had been there about a week and that he was feeling very upbeat.

---

25.  We cannot tell from the medical record the credentials of
the medical provider. There is an illegible signature on the
document under which is printed "Therapist
Signature/Credentials." Tr. 327.

24

Id.  Dr. Beidler noted that Smith's mood was good and he had no
suicidal ideations. Id.  Dr. Beidler noted that Smith suffered
from bipolar disorder and prescribed the medications Celexa,
Ambien, Abilify and Klonopin. Tr. 433.

The group home was Faith Friendship Villa, a licensed
personal care home (not a skilled care facility), located in
Mountville, Pennsylvania. Tr. 471. At the administrative hearing
held in this case Smith testified that he voluntarily went to the
group home because it was decided that it was best for him. Tr.
38. Smith was sent to live in the group home primarily because of
the part loneliness played in his condition. Tr. 163, 322 and 423.
Smith indicated that the home organized group activities, such as
bowling and bible study, but did not provide counseling services.
Tr. 38.

On August 11, 2008, Mark Hite, Ed.D., a psychologist,
reviewed Smith's medical records and concluded that Smith suffered
from bipolar disorder, a personality disorder and paraphilia. Tr.
349.  Dr. Hite concluded that Smith's basic memory processes were
intact, he could make decisions and carry out instructions, and
was able to maintain concentration and attention for extended
periods of time. Id.  Dr. Hite further found that Smith retains
the ability to perform repetitive work activities without constant
supervision and that there were no limitations in Smith's ability

25

to understand, remember and adapt. Id.  Dr. Hite concluded that

Smith had the ability to meet the basic mental demands of

competitive work on a sustained basis. Id.

A January 16, 2009, letter from Rick Morgan, Care

Ministry Director, at Faith Friendship Villa, states in relevant

part as follows:

> David has been pleasant and agreeable with our
> residents, staff and directors.  During the limited
> times that he has taken part in activities both inside
> and outside the home, we see indication that he enjoys
> the activities and can be sociable.  The majority of the
> time, however, is spent in his room. He can be difficult
> to motivate regardless of the activity.  More often than
> not, David comes to meals long after the other residents
> are seated.  There are occasions when David chooses not
> to eat, this after staff approaches and knocks on his
> bedroom door to inquire.  At these times, David is
> consistently found in bed.  Faith Friendship Villa
> receives, stores, documents and offers David his
> medications as prescribed.  Medication administration
> times (0730 and 2130) are often missed by David, and
> even though he is paged the staff needs to go to his
> room to remind him.  When he arrives, however, he is
> apologetic and pleasant.

Tr. 471.

On January 21, 2009, a one-time evaluation of Smith was

performed by Commonwealth Clinic Group. Tr. 486-488.  The medical

provider[26] concluded that Smith suffered from bipolar disorder and

---

26.  Again the signature is illegible. We assume that the Medical
Director of this facility who signed the evaluation is a medical
doctor practicing psychiatry or a Ph.D. level licensed
psychologist.

assessed him with a GAF score of 50. Id.  The medical provider
concluded that Smith was struggling with sex addiction, but had
not utilized a prostitute in a year.

On July 24, 2009, Plaintiff was evaluated by John
Tardibuono, Ed.D., a psychologist, at the request of the Bureau of
Disability Determination. Tr. 491-499.  Dr. Tardibuono concluded
that Smith suffered from a mood disorder, not otherwise specified;
an anxiety disorder, not otherwise specified; and obsessive
compulsive disorder. Tr. 494.  Dr. Tardibuono could not rule out
the possibility that Smith suffered from posttraumatic stress
disorder. Id.  Dr. Tardibuono believed that Smith lived in a
highly structured and supervised residential facility and that
Smith had been compliant with medications and ongoing therapy. Tr.
492, 495 and 498.  Dr. Tardibuono stated that "the addition of a
full time work setting would be overwhelming" and because of the s
"long standing nature of [Smith's] mental/emotional difficulties,
prognosis relative to return to work is too difficult to determine
at this time." Tr. 495.  Dr. Tardibuono gave Smith a GAF score of
43.

The record is devoid of any therapy records between July
2008 and August 27, 2009,[27] when Smith had an appointment at T.W.

---

27.  There is a letter dated November 9, 2009, from Catherine A.
(continued...)

Ponessa & Associates Counseling Services, Inc. Tr. 507-508.  On

August 27th Smith was evaluated by Letitia Alida Covaci, M.D. Id.

It was noted that Smith "present[ed] with no complaints on the

present combination of psychotropic medications, which he would

like to continue unchanged." Id.  The medications were Celexa,

Klonopin, Ambien and Abilify. Id.  Dr. Covaci concluded that

Smith suffered from bipolar disorder and could not rule out

obsessive compulsive disorder. In her report Dr. Covaci stated as

follows:

> The patient is neat and well groomed. He is alert,
> awake, and oriented times three. He is cooperative
> during the interview.  He appears relaxed and in no
> distress.  His speech is normal. His mood: "I'm
> good."  His affect is appropriate. He denies any
> psychotic symptoms.  He denies any suicidal or
> homicidal ideations.  Cognitive and memory is good.
> Judgment and insight is good.

Tr. 507.  Dr. Covaci assessed Smith with a GAF score of 60 to 65.

Id.  It was noted that this appointment was a "restart of

counseling." Tr. 508.

Smith was again seen at T.W. Ponessa & Associates

Counseling Services, Inc., on October 22, 2009, and evaluated by

---

27.  (...continued)
DeGuire, M.S., J.D., MBA, CEO, of T.W. Ponessa & Associates
Counseling Services, Inc., stating that Smith had an appointment
on December 17, 2008, and was diagnosed with paraphilia and
bipolar disorder and given a GAF score of 50 but no actual
therapy records were provided for that date.

Dr. Covaci. Tr. 511-512.  Dr. Covaci noted that Smith "present[ed]
with no complaints." and that "[h]e would like to continue
medications unchanged." Id.  Dr. Covaci concluded that Smith
suffered from bipolar disorder and could not rule out obsessive
compulsive disorder. In her report Dr. Covaci stated as follows:

> The patient is relatively neat and well groomed.
> He is alert, awake, and oriented times three. He is
> cooperative during the interview.  He appears
> slightly guarded.  His eye contact is fair. He is
> not very talkative. His mood: "I'm good."  His affect
> is somewhat restricted.  He denies any psychotic
> symptoms.  He denies any suicidal or homicidal
> ideations. Cognitive and memory is good. Judgment and
> insight is fair.

Tr. 511.  Dr. Covaci assessed Smith with a GAF score of 60 to 65.
Id.  This is the last medical appointment prior to the
administrative hearing which was held on October 27, 2009.

**DISCUSSION**

The administrative law judge at step one of the
sequential evaluation process found that Smith had not engaged in
substantial gainful work activity since May 15, 2008, the alleged
disability onset date. Tr. 14.

At step two of the sequential evaluation process, the
administrative law judge found that Smith had the following severe
impairments: affective disorders, anxiety disorders, and
personality disorders. Tr. 14.

At step three of the sequential evaluation process the administrative law judge found that Smith's impairments did not individually or in combination meet or equal a listed impairment. Tr. 14-15.  In so finding the administrative law judge reviewed listings 12.04(Affective Disorders), 12.06(Anxiety-Related Disorders) and 12.08(Personality Disorders).  The administrative law judge stated in relevant part:

> I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Repeated episodes of decompensation, each of extended duration, means three eipisodes within 1 year, or an average of once every 4 months, each lasting at least 2 weeks.
>
> In activities of daily living, the claimant has moderate restrictions.  The claimant currently lives in a group home, with few responsibilities.  There are no problems with personal grooming and hygiene.  He is physically capable of performing routine cooking, cleaning or shopping.
>
> In social functioning, the claimant has moderate difficulties. The claimant has shown extremely poor judgment historically, primarily due to sexual addiction.  He maintained a long term relationship with a girlfriend, which ended because of this.  He remains close with his family, although there is some indication of enabling by them and dependency on the part of the claimant. The claimant is able to relate adequately in clinical settings and social situations at the group home according to staff and his testimony.

30

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant has good cognitive abilities and evidences no significant abnormalities on mental status examinations.  He is capable of understanding and carryout (sic) simple tasks.
>
> As for episodes of decompensation, the claimant has experienced one to two episodes of decompensation each of extended duration.
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.
>
> I have also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the paragraph C" criteria.

Tr. 15.

At step four of the sequential evaluation process the administrative law judge found that Smith had "the residual functional capacity to perform a full range of work at all exertional levels but is limited to unskilled work."  Tr. 15.  He further found that Smith retained "the capacity to understand, remember and carry out simple instructions, respond appropriately to supervisors, coworkers and usual work situations, and deal with changes in a routine work setting." Id.  Based on that residual functional capacity, and Smith's age, education and work background, the administrative law judge found that Smith could perform his prior relevant unskilled, medium work as an industrial

cleaner. Tr. 19. Consequently, the administrative law judge did not proceed to step five of the sequential evaluation process and found that Smith was not disabled.

Smith's primary argument is that the administrative law judge erred by failing to find that his mental impairments met the requirements of Listing 12.04 and 12.06.  Smith also argues that the administrative law judge erred when he found that Smith had the residual functional capacity to perform the full range of work at all exertional levels but limited to unskilled work.  We have thoroughly reviewed the record in this case and find no merit in Smith's arguments.

Initially it should be stated that no treating physician, psychiatrist or psychologist has provided a functional assessment of Smith indicating that he is or was unable to perform any type of work for the requisite 12-month statutory period.

At step two the administrative law judge found that Smith suffered from severe impairments.  If Smith's severe impairments met or equaled a listed impairment, he would have been considered disabled per se and awarded disability benefits. However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  To do this a claimant must show that all of the criteria for a listing

32

are met Id.  An impairment that meets only some of the criteria
for a listed impairment is not sufficient.   Id.   To qualify for
benefits by showing that an impairment, or combination of
impairments, is equivalent to a listed impairment, Smith had the
burden to present "medical findings equal in severity to all the
criteria for the one most similar listed impairment."  493 U.S. at
531.  The Social Security regulations require that an applicant
for disability benefits come forward with medical evidence
"showing that [the applicant] has an impairment(s) and how severe
it is during the time [the applicant] say[s] [he or she is]
disabled" and "showing how [the] impairment(s) affects [the
applicant's] functioning during the time [the applicant] say[s]
[he or she is] disabled."  20 C.F.R. §§ 404.1512(c) and
416.912(c).

       The administrative law judge did not err when he found
at step three of the sequential evaluation process that Smith's
impairments did not meet or functionally equal Listings 12.04 and
12.06.   These listings have A, B, and C criteria.   Listing 12.04
is met if both the A and B criteria are met or the C criteria are
met.  Listing 12.06 is met if both the A and B criteria are met or
both the A and C criteria are met.  The Commissioner does not
dispute that the A criteria in this case have been met.  The issue

is whether the B and C criteria have been met.  Listing 12.04

stated in pertinent part as follows:

> 12.04 *Affective Disorders:* Characterized by a
> disturbance of mood, accompanied by a full or partial
> manic or depressive syndrome. Mood refers to a prolonged
> emotion that colors the whole psychic life; it generally
> involves either depression or elation.
>
> The required level of severity for these disorders is
> met when the requirements in both A and B are satisfied,
> or when the requirements in C are satisfied.
>
> *        *        *        *        *        *        *        *        *        *        *
>
> B. Resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social
> functioning; or
>
> 3. Marked difficulties in maintaining concentration,
> persistence, or pace; or
>
> 4. Repeated episodes of decompensation,[28] each of
> extended duration;
>
> OR
>
> C. Medically documented history of a chronic affective
> disorder of at least 2 years' duration that has caused
> more than a minimal limitation of ability to do basic
> work activities, with symptoms or signs currently

_____

28.  The term repeated episodes of decompensation, each of
extended duration is defined in the regulations as "three
episodes within 1 year, or an average of once every 4 months,
each lasting for at least 2 weeks." 20 C.F.R. Part 404, Subpart
P, Appendix 1, Mental Disorders, 12.00 C. 4.

attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.06 states in pertinent part as follows:

12.06 *Anxiety Related Disorders:* In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

35

4. Repeated episodes of decompensation, each of extended
duration.

OR

C. Resulting in complete inability to function
independently outside the area of one's home.

The administrative law judge concluded that Smith did not have an

impairment or combination of impairments which met or equaled

these listings.  Smith has proffered no medical opinion, nor has

he marshaled the evidence in the record, to support his contention

that his conditions meet or equal the requirements of Listing

12.04 or 12.06.  The administrative law judge appropriately relied

on Dr. Hite's opinion that Smith had the basic mental capabilities

to engage in competitive work on a full-time basis.  Although

Smith was residing in a group home from July, 2008, to the time of

the administrative hearing, no treating physician has opined that

Smith is unable to function outside the group home setting.

Furthermore, the most recent GAF scores of 60 to 65 suggest that

he has the ability to function outside of that setting.

As for Dr. Tardibuono's assessment the law does not

accord the opinions of non-treating, consultative physicians or

psychologist any special preference.  The administrative law judge

gave an adequate explanation for concluding that Dr. Tardibuono's

assessment was too restrictive.  In rejecting the opinion of Dr.

36

Tardibuono, the administrative law judge stated that Dr. Tardibuono's opinion was based on a misunderstanding of the facts, e.g., that Smith was compliant with his medications and therapy. Tr. 18.

The administrative law judge reasonably determined that Smith did not establish an impairment that would preclude his past work as a industrial cleaner. Smith worked for many years despite his mental health issues and as the administrative law judge noted there is no indication from the record that Smith's mental impairments impacted his work performance. Tr. 16.

The administrative law judge appropriately took into account Smith's mental limitations in his residual functional capacity assessment. He appropriately found that Smith could perform unskilled, medium work as an industrial cleaner.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

Dated: October 27, 2011

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID S. SMITH,                     :
                                    :
          Plaintiff                 :      No. 4:10-CV-02069
                                    :
     vs.                            :      (Judge Conaboy)
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
          Defendant                 :

<u>ORDER</u>

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1.   The Clerk of Court shall enter judgment in favor of the Commissioner and against David S. Smith as set forth in the following paragraph.

2.   The decision of the Commissioner of Social Security denying David S. Smith disability insurance benefits and supplemental security income benefits is affirmed.

3.   The Clerk of Court shall close this case.

_____   S/Richard P. Conaboy
                          RICHARD P. CONABOY
                          United States District Judge

Dated: October 27, 2011

38